30 Cal.App.4th 1778 (1994)
37 Cal. Rptr.2d 132
In re KRYSTLE D., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent,
v.
BRENDA B. et al., Defendants and Appellants.
Docket No. H011538.
Court of Appeals of California, Sixth District.
December 21, 1994.
*1785 COUNSEL
Jay B. Petersen, Violet Elizabeth Grayson and P. Cecilia Storr, under appointments by the Court of Appeal, for Defendants and Appellants.
Steven M. Woodside, County Counsel, and Diane L. Bennett, Deputy County Counsel, for Plaintiff and Respondent.
George Kennedy, District Attorney, and Robert Masterson, Deputy District Attorney, for Minor.
OPINION
PREMO, Acting P.J.
After Brenda B.'s parental rights to her daughter Krystle D. were terminated, she and her former husband, Krystle's former *1786 stepfather, John U., separately appeal. Brenda asserts that the proceedings were defective for lack of proper notice to her tribe under the Indian Child Welfare Act, 25 United States Code section 1901 et seq. (hereafter, the Act). John contends that the court erred in denying him standing and de facto parent status.

FACTS
Krystle was born on February 1, 1987, to Brenda, who became an enrolled member of the Kodiak Area Native Association (hereafter, the Tribe) in 1992. Krystle's alleged father, Alfredo D., is of Mexican descent. Krystle is one-eighth Aleut, Caucasian, and Hispanic. When Krystle was born, Brenda was married to and residing with John, although she had had a relationship with Alfredo for approximately a year. Alfredo saw Krystle in the hospital after her birth, but had no contact with her or Brenda thereafter.
For her first year, Krystle lived with Brenda and John, and her half-siblings, Jennifer U., then 10 years old, and Tony U., then 8. Brenda and John divorced later in 1987, and John was awarded sole custody of Jennifer and Tony. A blood test performed in 1988 revealed that John was not Krystle's father. She remained in Brenda's custody.
Brenda is a paranoid schizophrenic with a long history of alcoholism. She received support services from the Santa Clara County Department of Family and Children's Services (hereafter, Department) since Krystle's birth. Besides inpatient treatment, she had twice weekly outpatient therapy beginning in 1987, including services of a psychiatrist and medications (prolixin and desipramine) to control symptoms of schizophrenia and depression. She received treatment for alcohol abuse through Alcoholics Anonymous (hereafter, AA) meetings and sponsorship since 1986. She received subsidized child care for Krystle from 9 a.m. to 5 p.m. five days a week when Krystle was seven months old. The Department provided emergency intervention services four different times for a total of almost eight months since Krystle's birth in an effort to prevent the need to remove Krystle from her home.
In November 1990, when Krystle was about three years old, and after about three and one-half years of sobriety, Brenda started drinking again. On January 27, 1991, she called the Child Abuse and Neglect Reporting Center and requested a social worker to come to her home to take Krystle to the children's shelter. She said she was drunk and not capable of caring for her daughter. She stated she was afraid she would black out from the combination of alcohol and medication.
According to Brenda, the medication was not always effective in making the voices that she heard go away. She also was "in fear a lot." Alcohol relieved the fear.
*1787 The Department filed a petition to remove Krystle from the physical custody of her parent or guardian. (Welf. & Inst. Code, § 300.)[1] According to the evaluation submitted in support of the petition, Brenda stated she liked to attend AA meetings three times a day: at noon, at 5 p.m., and at 8:30 p.m. Ron C., a man with whom she had a relationship after they met at an AA meeting, took care of Krystle when Brenda attended AA meetings. Brenda stated that she became aware that Ron C. might have been molesting Krystle when Krystle started masturbating at school. She attributed her return to alcohol in part to the fact that she had been "in a sick relationship with a man that molested my daughter." Alcohol helped "to stop my feelings of sadness that Krystle has been hurt."
Immediately after Krystle was taken into foster care, John offered to take her. However, because of the allegations of sexual abuse and Krystle's complaint of nightmares involving her father, who "yells a lot and I'm scared," and because the Department felt that John could not be ruled out as an abuser, the Department recommended no contact with him.
John filed a motion requesting he be granted de facto parent status. He asserted that he had assumed, on a day-to-day basis, the role of parent, fulfilling the child's physical and psychological needs for care and affection, and that he assumed that role for a substantial period. (In re B.G. (1974) 11 Cal.3d 679, 692, fn. 18 [114 Cal. Rptr. 444, 523 P.2d 244]; Cal. Rules of Court, rule 1401(a)(4).)
In his declaration in support of the motion, John stated that Krystle had had a relationship with him since her birth; that she spent most evenings and all weekends in his care; that he treated her as his daughter and that his children, Krystle's half-brother and half-sister, had a normal sibling relationship with Krystle; that he was Krystle's psychological father; that his was the only family she had ever known and that she would miss the emotional closeness they enjoyed; that he was ready, willing, and able to participate in any counseling the court deemed appropriate and that he was then attending classes and counseling sessions to qualify as a foster parent; that he could bring to the proceedings information and insight by virtue of his relationship with them; and that if Brenda's reunification with Krystle failed, he wanted Krystle placed with him.
The trial court denied the motion in an order stating: "Declaration is insufficient at this time. Parties may further submit declarations. Parties *1788 waive right to have pro tem hear further motion." However, the court granted visitation to John and Krystle's half-siblings, and set a hearing on April 19, 1991, for "further [motion] for standing." On April 17, 1991, a minute order states that the "hearing previously set 4-19-91 is vacated." "Stepfather's motion withdrawn."
Not until May 3, 1991, did "Krystle's mother [tell] her first social worker that she was of Alaskan Eskimo heritage. The social worker gave [Brenda] a Request for Confirmation of Child's Status as Indian form [(hereafter, form)] to complete to assist in making the determination as to whether Krystle was also eligible for enrollment." Brenda lost the form.
Shortly thereafter, the next social worker assigned to the case, Michael Gammino, provided a second form, obtained the necessary information from Brenda, and initiated the first of more than 30 unfruitful contacts over the next 2 years with the Tribe, the Chugach Area Native Association, the Bureau of Indian Affairs (hereafter, BIA) and others in an attempt to develop a suitable placement under the Act for Krystle.[2]
The Department provided Brenda with reunification services for the first six months of Krystle's dependency. Brenda continued receiving therapy and *1789 medications for schizophrenia and treatment for alcohol abuse. She kept a regular schedule of visitation with Krystle. She complied with everything *1790 asked of her. Later, the Department added a parenting class to her service plan and continued reunification for an additional six months.
After a visit to Krystle in September 1991, Brenda went to Alaska, returning only to testify at a hearing in December 1992. She made no effort to visit Krystle during 1992, but sent occasional letters. Ron Newsome, Brenda's social worker in Seward, Alaska, reported in February 1992, that she suffered repeated alcoholic and psychiatric relapses.
*1791 In the meantime, Krystle, by then four years old, continued in therapy and made positive changes. Initially, she had difficulty interacting with children her own age, and resorted to temper tantrums when she did not get her own way. However, she began to attend preschool on a daily basis and adjusted well to it. While she had weekly visits with her mother and biweekly visits with John, Jennifer, and Tony, she demonstrated affection and enthusiasm upon seeing them but did not cry or become upset at the conclusion of these visits, even after Brenda left the area and John, Jennifer, and Tony were allowed to visit every week. Her masturbatory behavior "subsided only to masturbating before she goes to bed." She attended weekly counseling sessions and responded favorably to the therapy.
When Krystle turned five, however, her court designated child advocate, Carol L. Boman, reported: "[e]ven though Krystal's[[3]] current placement is very healthy, lots of pets, kids and, a very loving family. She knows it is not her permanent home. Krystal is smart enough to notice other foster children being adopted and she wants to know if Anna [her foster mother] will adopt her or if someone else will. This has caused some strain on the foster home."
Krystle's therapist noted that Krystle's foster mother reported "a deep anger and resistance" on Krystle's part as well as questioning why the foster parents could not "take care of two five year olds?" when she learned of their adoption of another foster child. However, Krystle denied such anger to the therapist.
In addition, Boman stated: "apparently John[U.] has been putting pressure on Krystal to come and live with them, which has bothered Krystal to the extent that she was crying about it at night. I think that the visits with Krystal's sibling is important to her, but because of the pressure that Krystal's stepfather seems to be putting on her I would like the visits to be changed to monthly and I strongly recommend that they continue to be supervised."
In February 1992, Gammino recommended termination of reunification and setting for a permanency planning hearing (§ 366.26) based on Brenda's move, noncompliance with services, and relapses. Hearing was set for June 23, 1992.
At that time, Krystle's advocate reported: "Recently I have seen disturbing changes in this five yr. old. On a trip to the Strawberry Festival ... she *1792 stole two pairs of earrings and hid them from me. She acted upset and wanted to go home at which time I discovered the stolen property.
"Anna told me of many similar incidences at home. In a 30 minute conversation with Anna, I discovered that Krystal continually takes property from family members, destroys things, ties things together, and pulls dolls apart. When confronted she covers her ears and won't listen....
"According to Anna there seems to be no improvement in therapy. Anna feels that Krystal ... is clever enough to tell the therapist `what she thinks she wants to hear'...."
In an evaluation conducted in July and August 1992, child psychiatry fellow Dr. Dea Eisner of the Children's Health Council "observed [Krystle] to have evidence of a Reactive Attachment Disorder of Childhood. This disorder, while related to having inadequate care and multiple caregivers prior to placement in foster care, is further exacerbated by the lack of permanent placement in a stable, nurturing and supportive home. The implications of her disturbed attachment are multiple, including development of a negative self image, lack of trust of others, and either a pattern of withdrawal from others or a pattern of inappropriate familiarity with people that puts her at risk of becoming involved in abusive relationships. This has many implications for her emotional development."
At this point, because of the change for the worse in Krystle's behavior, and "[g]iven the fact that the tribe had, despite my numerous attempts to involve them, regarding placement issues, had not really come up with a plan," Gammino made the decision to terminate parental rights. He found, but did not immediately place Krystle in, a fost-adopt home of parents of suitable ethnicity. The father was Caucasian and the mother was of Native American (unregistered) and Hispanic descent. The 13-year-old daughter was very academically oriented and successful in school. Gammino initiated a series of highly successful preplacement visits between Krystle and the family.
Notice of a permanency planning hearing (§ 366.26) was sent by certified mail on August 28, 1992, to the Ouzinkee Tribal Council, the Tribe, and the Chugach Alaska Corporation. The notice stated: "If you wish to participate in the legal decisions being made for Krystal [D.], you must do so by September 25, 1992, as the court may proceed to terminate parental rights and make permanent placement orders at that time."
The notice contained a large, boldface, boxed statement reading: "IMPORTANT NOTICE [¶] A hearing under Welfare and Institutions Code section *1793 366.26 has been set for the date and time stated on the other side of this form. [¶] At the hearing the court may: [¶]  terminate parental rights and free the children for adoption [¶] or [¶]  establish legal guardianship [¶] or [¶]  place the children in long-term foster care. [¶] You have the right to be present at this hearing and have an attorney represent you."
On September 25, the court ordered the Department to contact the Tribe regarding possible relative placements and continued the hearing to December 1, 1992.
On November 17, 1992, John filed a second motion for standing as a de facto parent. Brenda and the Chugach Alaska Corporation were sent notice by mail. John's motion was heard and taken under advisement on December 1.
On November 30, 1992, Brenda filed a petition for modification of the dependency orders. (§ 388.) She notified the Chugach Alaska Corporation. She asserted that she had been sober, attending AA and mental health meetings, and had been taking her medication consistently for six months. She had subsidized housing and had received custody of 15-year-old Jennifer in August. She had requested parenting classes through the department of family and youth services in Seward, Alaska. She requested custody of Krystle or, in the alternative, Krystle's placement in a special needs foster home in Seward. Her motion was denied on December 3; however, she was granted rehearing as of right because the proceedings were not taken down by an official reporter. (§ 252.) Hearing was set for December 11.
On December 4, Gammino called Constenius who stated the Kodiak Association would not intervene so long as Brenda was represented by counsel and that they would not be present at the hearing set for December 11.
On December 11, both Brenda's section 388 petition and John's motion for standing were denied. Gammino was ordered to place Krystle in permanent placement pending a December 22 hearing.
On December 14, 1992, Gammino placed Krystle into the fost-adopt home. Boman reported: "WE TOLD HER THIS WAS GOING TO BE HER FAMILY."
Gammino observed positive changes almost immediately. "[Krystle] was able to display affection. [¶] ... [S]he was becoming attached, ... she called these people mommy and daddy. [¶] [] [S]he told me that she ... had *1794 a family." She displayed affection, and "was able to run up and hug.... state what she wanted. To be picked up, to be held, to be cuddled. I'd not seen that before."
On January 22, 1993, Constenius sent a letter directly to the court indicating that the Tribe was intervening in Krystle's case. The Tribe filed a motion to intervene which was granted on January 26. On February 5, 1993, Gammino received a faxed copy of a letter Constenius directed to Commissioner McCarthy of the juvenile court stating that the Tribe had not been "notified" of the December and January hearings.
The Tribe filed a motion "on Notification Pursuant to the Indian Child Welfare Act [25 U.S.C. § 1901 et seq.]." It sought to invalidate Krystle's placement because of lack of proper notice. The Tribe asserted that "proper actual notice, had it been given, would have to specifically appraise [sic] the tribe of its right to assert jurisdiction, and to intervene, pursuant to the ICWA. Phone calls to representatives of the Kodiak tribe, by a social worker are insufficient. Moreover, actual notice, by registered mail, need to be sent before `any child custody proceedings ...'. [sic] ... Here, numerous proceedings have already passed, where the Kodiak tribe either received mere boilerplate notices of the pendency of hearings sent by regular mail, or no notice at all. Since they were not sent registered, return-receipt mail, and did not specifically appraise [sic] the Kodiak tribe of their right to jurisdiction or intervention under the ICWA, the notice here has failed. Such failure is prejudicial error."
The motion was heard on March 15, 1993, and was denied. The matter was set for trial on March 17 and assigned out on that date. The Tribe participated in the trial. Nonparty John was present. The matter was estimated to take three days and took a contentious twelve days spread over four months.
After hearing voluminous testimony and receiving numerous exhibits, the trial court found that all necessary parties were properly noticed and that the notice provisions of the Act were met; that active and reasonable efforts to provide reunification services and rehabilitation programs designed to prevent the breakup of the Indian family were made consistent with the Act and that those efforts proved unsuccessful; that "[b]eyond a reasonable doubt, continued custody of the minor by the mother is likely to result in serious emotional damage to the child; [and that] this finding is made pursuant to [the Act]."
The court then made specific findings concerning Brenda's inability to provide the parenting that Krystle, as a special needs child, required; found *1795 that there was no Indian custodian under the Act, and that it need consider only whether it would be detrimental to remove Krystle from her mother's custody under the Act; and that it would be detrimental not to terminate parental rights in this case.
The court ordered Brenda's parental rights terminated, and continued Krystle as a dependent child of the court with approval for continued placement in the preadoptive home where she then resided. The court found that the home met the placement preferences of the Act, and that there was no extended family member described by the Act or "foster home licensed, approved or specified by the Indian child's tribe" available to meet Krystle's special needs. "[I]n fact despite the social worker's exhaustive work in the case including going to the State of Alaska and despite the lengthy time this case has been pending the tribe failed to provide a placement for the child[.]" This appeal ensued.

Contentions on Appeal
Brenda contends that the notice required by the Act was not given to the Kodiak Tribe or to her; that federal evidentiary standards outlined in the Act were not met; that the minor's best interests required maintenance of tribal ties; that the Act required that a hearing be held whenever there was a change in foster placement, so all the movements of Krystle from one foster home to another were invalid; that the Act required placement of Krystle with extended family members; and that the remedy for violation of provisions of the Act was invalidation of the proceedings.
In a separate appeal, John asserts that the trial court erred in denying his motions for standing and de facto parent status; that the court should have respected the statutory preference for extended family placement and placed Krystle with him as stepfather and de facto father; and that the judgment should be reversed because his "court appointed counsel failed to provide effective assistance [in regard to his motions for de facto status], thereby prejudicing John's case[.]"

Scope of Review
(1) In reviewing the findings of the trial court made pursuant to the Act, we must decide if the record contains evidence which is reasonable, credible, and of solid value such that a reasonable trier of fact could find beyond a reasonable doubt that termination of parental rights is appropriate. (25 *1796 U.S.C. § 1912(f).)[4] Consequently we "employ[] the substantial evidence test by which we review the record in a light most favorable to the judgment and must uphold the trial court's findings unless it can be said that no rational factfinder could reach the same conclusion. [Citation.]" (In re Heather B. (1992) 9 Cal. App.4th 535, 563 [11 Cal. Rptr.2d 891].)

Notice
(2a) Brenda asserts that the only effective notice which would apprise the parent and tribe of an Indian child of a state court involuntary child custody proceeding is registered mail with return receipt requested as required by the Act.[5]
"In this case, no notice of any proceeding in this matter was ever sent by registered mail with return receipt requested.... The Department admits that it did not literally comply with the Notice requirements of the Act.... The Department argued ... that Mr. Gammino had gone to great lengths to speak with tribal members and to let them know what was going on in the case.... [However,] such communications do not necessarily constitute sufficient notice under the ICWA."
Brenda claims that In re Kahlen W. (1991) 233 Cal. App.3d 1414, 1423 [285 Cal. Rptr. 507], holds that failure to comply with the notice provisions of section 1912(a) is prejudicial error and that "[s]ubstantial compliance or partial compliance with these notice requirements has been determined to be insufficient and grounds for invalidation of termination of parental rights."
This is a question we need not reach. In the instant case, the Tribe moved to intervene and the motion was granted.[6] "... An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claiming what is *1797 sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and the defendant...." (Code Civ. Proc., § 387, subd. (a).)
Upon the granting of its motion to intervene, the Tribe filed a motion asserting that it had not received proper notice, requested reversal of orders of prior and current placements, and demanded placement of Krystle "in the now-waiting foster home in Seward, Alaska, approved and designated by the Tribe."
(3a) "The nature of the appearance made ... is not determined by the intentions of the party making the motion. Whether an appearance is general or special depends upon the relief sought." (Milstein v. Ogden (1948) 84 Cal. App.2d 229, 232 [190 P.2d 312].) At the hearing on the motion if the Tribe sought only to litigate the sufficiency of the service, the appearance would have been a special appearance. "A defendant who desires to stand upon the ground that the court is without jurisdiction over his person must specially appear for that purpose only and ask nothing further. [Citations.]" (Id. at p. 233.) (2b) However, when the Tribe sought to invoke the discretionary power of the trial court to invalidate its placement orders and place Krystle in a foster home it chose, it asked for relief "which could only be given to a party in a pending case, or which itself would be a regular proceeding in the case...." (In re Clarke (1899) 125 Cal. 388, 392 [58 P. 22].) The Tribe therefore appeared generally in the case. (3b) "It is the character of the relief asked, and not the intention of the party that it shall or shall not constitute a general appearance...." (Id. at p. 392.)
"As a rule one cannot avail himself of the advantage of being a party and escape the responsibilities. Some early cases in this state [citations] seem to hold that a defendant having first objected to the process or service by which he was brought in, may then, if his objections are overruled, answer to the merits, and on appeal from the judgment still avail himself of his objections to the jurisdiction of the court over him. This rule seems unjust and illogical, and I think does not prevail elsewhere. It gives the defendant, whose objections to the jurisdiction of the court have been erroneously overruled, an opportunity to go to trial, and if the judgment is favorable to abide by it, while if it is unfavorable he can procure a reversal. The plaintiff would have no such advantage. And what would be the condition of such a defendant after reversal? If the reversal means that he is not yet in the case, he may move to dismiss.... If it merely gives him a new trial, the procedure seems farcical." (In re Clarke, supra, 125 Cal. at p. 392.)
*1798 (2c) In the instant case, the proceedings did not frustrate the policies of the Act, which are to promote the interests of the Indian child and to promote the stability and security of Indian tribes and families. Although notice is arguably defective because of the Department's failure to comply with the technical requirement of registered, not certified, mail, with return receipt requested, the purpose of giving notice was obtained. "Notice ensures the tribe will be afforded the opportunity to assert its rights under the Act irrespective of the position of the parents, Indian custodian or state agencies. Specifically, the tribe has the right to obtain jurisdiction over the proceedings by transfer to the tribal court or may intervene in the state court proceedings. Without notice, these important rights granted by the Act would become meaningless. [Citation.]" (In re Kahlen W., supra, 233 Cal. App.3d at p. 1421, italics added.)
The Tribe, by motion granted, intervened in the action. By relief requested, it appeared generally and participated fully in the trial of the issue of the termination of the mother's parental rights and the placement of the child. Since reversal of the judgment on the ground of failure of notice where the Tribe actually participated in the proceedings "merely gives [appellant] a new trial, the procedure seems farcical." (In re Clarke, supra, 125 Cal. at p. 392.) We decline to order it.

Federal Evidentiary Standards
(4) Brenda next contends that the evidence does not support the trial court's finding beyond a reasonable doubt that her continued custody of Krystle would result in serious emotional damage to the child. Brenda also challenges the sufficiency of the testimony of the Department's expert witnesses on the basis that they either did not have an opinion whether her parental rights should be terminated or thought it would be detrimental for Krystle never to see her mother again.
"No termination of parental rights may be ordered ... in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (§ 1912(f).)
In the instant case, the evidence established that Brenda suffered from schizophrenia and alcoholism which she attempted to control with medication and counseling. Nevertheless, she suffered periodic relapses and was unable to maintain a stable life for a significant period of time even for herself. In Alaska, she received support services from the Seward Life *1799 Action Council (hereafter, SLAC), which included counseling sessions (which she attended only sporadically), medication (prolixin and desipramine), and help budgeting her money, grocery shopping, transportation, and food preparation.
Although the evidence established that Brenda loved and wanted Krystle, it also showed that her parenting skills, barely adequate for an infant, were inadequate for the child with "serious psychiatric dysfunction" and "severe behavioral difficulties" which Krystle had become. For example, in an assessment requested by the court during the pendency of the trial, Dr. Anthony Atwell concluded that Brenda's "ability to function as a long-term parent to her daughter until her daughter reached the age of majority was not possible." Brenda's paranoid schizophrenia was a major factor, but "[i]n addition, her episodic and intense use of alcohol and other drugs in the past was as significant a problem." Furthermore, "there was not a sustained period of freedom from these two severe diagnoses[, and] [¶] ... [Brenda's] own background and experience ... as a child and adolescent gave her no model for even basic adequate parenting."
Dr. Atwell observed that "Krystle was very much anxious during the interaction with her mother. [¶] ... [S]he did an incredible amount of testing, manipulating and pushing the limits, which her mother was not able to successfully deal with."
Furthermore, although the fact that Jennifer had started to live with Brenda in Seward was presented as proof that Brenda could furnish a good home for Krystle, the evidence was conflicting as to how well Brenda coped with Jennifer. The Tribe sent a letter to the trial judge stating that "[t]here have been no problems [with Jennifer], [Brenda] has proven herself to be a concerned, loving parent to Jennifer. They have their own apartment with adequate living space for Krystle."
However, during the trial, when Gammino went to Alaska to obtain "accurate information about relatives, potential foster/adoptive homes and services in Alaska," he learned that "Jennifer is not really doing well in Seward. Specifically, [social worker Ron Newcome] is aware of Jennifer coming home very late or staying out all night with her current boyfriend, drinking alcohol and occasionally even `getting drunk'.... [H]er school attendance is `okay' and ... her grades are: one `B', one `C', one `D+' and one `F'. Both [Newcome] and Suzanne Price [Brenda's SLAC therapist] indicated that attendance can be deceiving because there is little else for the teens to do in Seward. Mr. Newcome indicated that he is very concerned about Jennifer's current sexually acting out behavior...."
*1800 Furthermore, "the apartment manager for [Brenda]'s complex ... was concerned about Jennifer and her boyfriend spending time there unsupervised and [said] that [Brenda] was about to be evicted.... [Newcome] believes that [Brenda] is having a difficult time with Jennifer. When I [Gammino] asked if Jennifer were younger would it be likely that she would be placed in protective custody herself, he said yes."
Gammino reported that Newcome felt that "considering the problems that [Brenda] is having caring for Jennifer with all of the services in place, ... he questions how [she] could care for Krystle. He said [Brenda] is not stable enough and has difficulty handling simple tasks."
Gammino visited Kodiak Island. He reported: "Ms. [Cecilia] Esparza [social work supervisor for the Kodiak division of the department of family and youth services] informed me that they currently have approximately 400 children from Kodiak Island placed in the Anchorage area due to the lack of foster homes in Kodiak and most of these homes are non-Native homes.
"I described Krystle's behavior to Ms. Esparza and she agreed that Krystle is a special needs child and for that reason alone she stated that it is important to be sure that if Krystle is placed in Kodiak, the foster parents would need to be both skilled and supported in caring for Krystle."
Newcome summarized the position of the division of family and youth services in a memo to Gammino dated April 6, 1993. In it, he stated that "it clearly would not be in Krystal's best interest to be placed in Seward; there are no foster homes [Alaska Native or otherwise] willing to accept this child; existing educational/mental health services are in no way adequate to meet Krystal's needs at even the most minimal level[;] Brenda is not ready to assume responsibility for this child and for these reasons my supervisor Linda Perry has specifically directed me to not accept this child for placement...."
Finally, when Gammino updated his report for the court during trial, Brenda told him "she is not on speaking terms with either of [her stepparents in Alaska] and ... if Krystle were with her she would not permit any contact with them. [Brenda] then stated that she was having second thoughts about taking Krystle. She went on to state that she wanted Krystle to have a better life than she had had and if Krystle was already placed in a home consisting of a mother and a father and that she wouldn't be in foster care for her childhood, she could be satisfied with that arrangement."
Gammino's report continues that Brenda said she was going to call her attorney. She apparently did so, because "Ms. [Katherine] Alexander called *1801 me and accused me of manipulating Brenda into saying that to me and requested that I stay at my desk for [Brenda] to call me back. [Brenda] did call me back within a short while and stated that she was in a bad mood, didn't mean what she said and that `a child should always stay with her mother'."
The evidence in the record, recounted in part above, establishes beyond a reasonable doubt, as required by the Act, that Brenda's continued custody of Krystle was likely to result in serious emotional and physical damage to the child.
(5) Next, appellant complains that "no testimony from an expert with knowledge of and sensitivity to Indian culture was provided. Although the trial court found Dr. Atwell to be an expert under the [Act], the record does not indicate that Dr. Atwell possesses particular and significant knowledge of Indian culture." However, appellant also states: "It is notable that the only experts with specialized knowledge of Indian customs and childrearing practices were Marilyn St. Germaine and Dr. Winter, and neither of these experts advocated terminating appellant's parental rights."
Apparently, appellant interprets the phrase "testimony of qualified expert witnesses," in section 1912(f) to allow expert opinion testimony on whatever relevant subject to be given only by persons who also have knowledge of and sensitivity to Indian culture. For this reading of the statute, appellant refers us to a commentary on the "Guidelines for State Courts; Indian Child Custody Proceedings," promulgated by the BIA of the Department of the Interior. (44 Fed.Reg. 67584-67595 (Nov. 26, 1979) hereafter, Guidelines.)[7]
The Guidelines state: "Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:
"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
*1802 "(iii) A professional person having substantial education and experience in the area of his or her specialty." (44 Fed.Reg., supra, at p. 67593.)
The commentary observes: "The second subsection makes clear that knowledge of tribal culture and childrearing practices will frequently be very valuable to the court. Determining the likelihood of future harm frequently involves predicting future behavior  which is influenced to a large degree by culture. Specific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm." (44 Fed.Reg., supra, at p. 67593.)
We are satisfied that neither the Guidelines nor the commentary restricts expert opinion witnesses to those who combine whatever other expertise they have with an expertise in tribal culture and childrearing practices.
In California courts, "[i]f a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, ... that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates...." (Evid. Code, § 801.)
In the instant case, the record established that Dr. Atwell, Dr. Eisner, an evaluator and a child psychiatrist who was accepted as an expert in children's psychiatric and emotional disorders, and Dr. Anna Muelling, a psychiatrist and Dr. Eisner's supervisor, are experts under both subdivision (iii) of the Guidelines and the Evidence Code. Witnesses of the same type (a psychiatrist and social workers with no demonstrated cross-cultural expertise) in a child custody proceeding under the Act were accepted as experts by a federal court in Matter of R.M.M. (Minn. 1982) 316 N.W.2d 538, 541. Nothing in the Act, the Guidelines, or the commentary supports Brenda's position that the Act precludes presentation of otherwise admissible expert opinion evidence because the witness did not have an expertise in Indian matters.
Furthermore, as appellant acknowledges, the court had the benefit of testimony of experts in tribal customs and childrearing practices. Dr. Amal Barkouki-Winter, a clinical psychologist who was trained in cross-cultural psychology and sociology and who was "a product of a cross-cultural breeding, myself," testified about cultural, philosophical, and social differences between Indians and "mainstream white Americans." Marilyn St. *1803 Germaine, a social worker at the American Indian Child Resource Center in Oakland, testified as an expert on the effects on Indian children who are adopted out of their tribe. She also expressed the opinion that the services available in Alaska for Krystle and Brenda were satisfactory and that it would be in Krystle's best interests to be placed near her mother in the tribe.
Although their testimony on the issue whether Brenda's parental rights should be terminated conflicted with that of other witnesses, it is the province of the trier of fact to resolve conflicts in evidence and decide the ultimate issue. These conflicts were resolved against Brenda by the trial court and cannot serve as a basis for reversal on appeal. (In re Heather B., supra, 9 Cal. App.4th at p. 563.)
The record satisfies us that the trial court received the expert opinion testimony required by the Act on the issue whether serious emotional or physical damage to the child would result from the continued custody of the child by the parent.

Krystle's Best Interests
(6) Appellant contends that the trial court erred in finding there was no detriment to Krystle in the termination of appellant's parental rights in the absence of evidence showing "how the severing of appellant's and Krystal's relationship might affect Krystal's tribal membership.... [or] possible benefits that Krystal may be entitled to through her tribe. Without this evidence the trial court could not objectively find that the termination of appellant's parental rights would not be detrimental to Krystal."
"The burden of producing evidence as to a particular fact is on the party against whom a finding on [that] fact would be required in the absence of further evidence." (Evid. Code, § 550, subd. (a).)
The Tribe produced evidence on the psychosocial benefits of tribal upbringing and membership. It had the opportunity to produce evidence on other benefits to which membership would entitle Krystle and the effect of the severance of the parent-child relationship on her tribal membership. If the Tribe failed to produce such evidence, it was the Tribe's choice. "[T]he only effect of the rule [of the burden of producing evidence] is `the risk of non-persuasion.' And the concomitant obligation to go forward in the proof when not met may result in failure to convince the trier of facts. [Citations.]" (Pacific Portland Cement Co. v. Food Mach. & Chem. Corp. (9th Cir.1949) 178 F.2d 541, 546.)
On the record before us, substantial evidence supported the trial court's finding that termination of appellant's parental rights would not be detrimental to Krystle.
*1804 (7) Brenda next contends that the Act requires that a hearing be held and the mother and the tribe given notice via registered mail, return receipt requested, whenever there is a change in foster placement. She bases her position on section 1916(b), which provides: "Whenever an Indian child is removed from a foster care home or institution for the purpose of further foster care, preadoptive, or adoptive placement, such placement shall be in accordance with the provisions of this chapter...." The "provision[] of this chapter" which she claims requires notice and a hearing on each change in placement is the notification provision of section 1912(a). She claims neither she nor the Tribe received such notice before any of the interim moves in September 1991, July 1992, and December 1992.
We reject this interpretation of sections 1916(b) and 1912(a). As discussed above, the purpose of the notice provision of section 1912(a) is to "ensure[] the tribe will be afforded the opportunity to assert its rights under the Act.... [or to] intervene in the state court proceedings." (In re Kahlen W., supra, 233 Cal. App.3d at p. 1421.) Once the Tribe (or the parent) is a party, there is no necessity to repeat that formal notice. If a statute requires notice of subsequent proceedings to be given, it may be given to the party or his or her attorney. (Code Civ. Proc., § 1010.)
As applied in this case, the mother was a party from the inception of the case. She was represented by counsel. A survey of the minute orders in the clerk's transcript show that she, her counsel, or both were present at the hearings in the case. Pursuant to statute, "[e]very hearing conducted by the juvenile court reviewing the status of a dependent child shall be placed on the appearance calendar. The court shall advise all persons present at the hearing of the date of the future hearing, of their right to be present and represented by counsel." (§ 366.2, subd. (a).) Brenda does not now complain that she was not so advised.
The Tribe was not a party from the beginning of the case. The possibility that an Indian tribe should be notified did not arise until May 1991. From that time until January 1993, Gammino embarked on a lengthy and frustrating endeavor to determine whether Krystle had tribal membership and, if so, in which tribe. Several native area associations had actual knowledge of the ongoing proceedings even though they did not have statutory notice. They informally declined to intervene until reunification proceedings were terminated. In the meantime, a four-year-old child had become a six-year-old child by 1993, and her psychological condition was seriously deteriorating. As vigorously as the Tribe subsequently asserted its rights in court, no policy in the Act countenances inexplicable and unjustified delays in tribal responses at the expense of serious trauma to a small child whose future life is at the core of the issue.
*1805 (8) Brenda further complains that the Tribe did not receive notice of changes in Krystle's interim placements. Brenda seems to be asserting that Gammino should not have moved Krystle from one foster home to another as circumstances changed without input from Brenda and the Tribe. Neither the Act nor the Welfare and Institutions Code gives the parent or Tribe the authority to select the foster home of a dependent of the juvenile court. No right of Brenda or the Tribe was violated by Gammino's management of Krystle's interim placements.

Placement Preferences Under the Act
(9) Next, Brenda contends that Krystle's placements violated the placement preferences outlined in the Act because she was not placed with extended family members or in other Indian foster homes.
"... In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with  [¶] (i) a member of the Indian child's extended family; [¶] (ii) a foster home licensed, approved, or specified by the Indian child's tribe; [¶] (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or [¶] (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." (§ 1915(b).)
Brenda declares that the trial court erroneously ordered Krystle placed in the original foster homes and her fost-adopt home because none of them conformed with the placement preferences outlined in the Act. Furthermore, although Krystle's fost-adopt home "may qualify" as an Indian foster home licensed by an authorized non-Indian licensing authority, the court erred in determining that no extended family members existed with whom to place Krystle.
"`[E]xtended family member' shall be defined by the law or custom of an Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 1903(2).)
Brenda states: "In this case, nothing in the record indicates the law or custom of the Kodiak Tribe regarding identification of extended family members.... The trial court's conclusion that John U. and appellant's brother and sister were not extended family members is unsupported by the evidence presented to the court. It cannot be determined whether these *1806 people are extended family members without evidence regarding Kodiak tribal customs and laws relating to extended family. If John U. or appellant's brother and sister are extended family under the Act, they are a first priority placement for Krystal and Krystal must be placed with them absent good cause to the contrary."
In addition, Brenda attacks the court's finding that good cause existed to alter the placement preferences of the Act because Krystle's special needs required her to remain in her current placement. She declares that nothing before the trial court indicated that John or her brother or sister would be unable or unwilling to follow through with Krystle's counseling.
As stated above, "[t]he burden of producing evidence as to a particular fact is on the party against whom a finding on [that] fact would be required in the absence of further evidence." (Evid. Code, § 550, subd. (a).) The Tribe did not present evidence from which the court could conclude that Brenda's ex-husband John, and her brother and sister who were adopted out of the tribe in their youth, would be considered extended family members under tribal law or custom.
Furthermore, no evidence was placed before the court that appellant's brother or sister sought serious consideration as a fost-adopt parent for Krystle or that John, despite his willingness to try, could cope with her needs.
We are satisfied that the evidence before the court supported its determination that there was no extended family member pursuant to the Act, that there were no foster homes licensed, approved, or specified by the Indian child's tribe pursuant to the Act; that the Tribe failed to provide a placement for the child; that the current foster parents were an Indian foster home licensed or approved by an authorized non-Indian licensing authority, namely the Department, and that they were therefore within the preadoptive placement preferences specified by the Act; and finally, that there was good cause to change the placement preferences of the Act.
Krystle was a special needs child whose development suffered during the lengthy time the case was pending to the point where she suffered severe psychiatric and behavioral disorders. Every reasonable opportunity was given the Tribe to develop a placement for Krystle which it considered more appropriate. The trial court did not err in concluding that the family and tribal placement preferences of the Act could not be met.

*1807 Invalidation

(10) Finally, Brenda asserts that "the provisions of section 1912 have been violated in these proceedings. Accordingly, the court's order terminating appellant's rights and freeing Krystle from parental custody and control should be invalidated."
She relies on section 1914, which provides: "Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, ... may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title."
In this case, the Tribe appeared and participated in the trial of this action. Therefore, although its rights may have been technically violated by not receiving notice via registered mail, return receipt requested, it nevertheless had the opportunity to assert its rights under the Act. Since invalidating the order terminating Brenda's parental rights "merely gives [appellant] a new trial, the procedure seems farcical." (In re Clarke, supra, 125 Cal. at p. 392.) We shall not so order.

De Facto Parent Status and Competence of Counsel
(11a) In his appeal, John contends that the court erred in denying his motions for standing and de facto parent status. He also asserts that the court erred in failing to respect the statutory preference for extended family placement. We have addressed the latter issue above.
(12) As to John's motions for de facto status, the trial court's denial of the first motion is not appealable. It was an intermediate order which did not necessarily affect the judgment or order appealed from and did not substantially affect the rights of the party (Code Civ. Proc., § 906) since the trial court allowed John to submit a further motion.[8]
(11b) John submitted his second motion on November 17, 1992. It was denied without comment on December 11, 1992. John declares: "The court's *1808 denial of John's motions for standing and de facto parent status are not supported by substantial evidence. The court made no findings that John did not fulfill the role of a parent for the first four years of Krystle's life."
The Department opposed the motion for standing on the basis that John did not provide day-to-day care for Krystle after John's and Brenda's marriage was dissolved in the first year of Krystle's life. The Department asserted that although there had been visitation thereafter, Krystle was out of John's care for a substantial period of time. Furthermore, she was diagnosed as having a reactive attachment disorder which was the result of not having an adequate and appropriate type of psychological parent-child relationship with an adult caretaker. Finally, John had no current independent, unique information that he could provide to the court about Krystle's needs, wants, emotional status, "and that sort of thing."
The resolution of conflicts in evidence is a matter for the trier of fact. Although John's motion stated that he was Krystle's "sole caregiver during virtually all of her waking hours not spent at school," Brenda's statements to the Department indicated that Krystle had other, frequent caregivers. In addition, from the time Krystle was placed in foster care John was allowed only supervised visitation with her. By the time the matter came for trial, he was not a psychological parent. Although Krystle was glad to see John, she was not bonded with him. Her psychiatric disorder was a result of not having a psychological parent. There was substantial evidence to support the court's denial of John's motion.
(13a) John asserts that his second court-appointed attorney was also ineffective.[9] He maintains she should have accompanied the motion with a declaration from him. Furthermore, the motion should have referred to or addressed the denial of the earlier motion for de facto parent status. Finally, counsel should have made an attempt to rebut the arguments made by the Department's counsel and should not have "meekly" accepted the ruling denying the motion without asking the court for the reasons for the decision. John contends that this conduct prejudiced his case and fails to meet the effective assistance standard.
(14) "Ineffective assistance of counsel presents a cognizable claim of error on appeal from proceedings to terminate parental rights, since [the] due process right to counsel in such proceedings would otherwise be a hollow right. [Citations.]" (Adoption of Michael D. (1989) 209 Cal. App.3d 122, 135 [256 Cal. Rptr. 884].)
*1809 A litigant claiming ineffective assistance of counsel must demonstrate that counsel's deficient performance prejudiced his case, that is, that absent counsel's error a reasonable probability exists that the outcome would have been more favorable. (Strickland v. Washington (1984) 466 U.S. 668, 693-695 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].)
(13b) In the instant case, we have determined that substantial evidence supported the trial court's conclusion that John was not a de facto parent and that he was not prejudiced by counsel's performance. It is unlikely that the motion would have been granted even with a declaration such as the one John submitted in support of his first motion, even if his counsel pointed out that John had not been caring for Krystle on a day-to-day basis since her removal from Brenda because the Department would not let him, and even if counsel did not "meekly accept[] the ruling ... without asking ... for the reasons" for the decision.
"[A] claim of constitutionally inadequate representation requires proof of two components, deficient performance and resulting prejudice, but the former component need not be examined if prejudice is not shown. [Citations.]" (People v. Hayes (1990) 52 Cal.3d 577, 612 [276 Cal. Rptr. 874, 802 P.2d 376].)

DISPOSITION
The judgment is affirmed.
Elia, J., and Bamattre-Manoukian, J., concurred.
NOTES
[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] Gammino listed the contacts he made in a declaration submitted to the court. On May 23, 1991, he telephoned Kelly Simeonoff, president of the Tribe. Simeonoff requested that Gammino send the form directly to the executive director of the association. On July 15, 1991, Gammino sent a letter and the form as requested.

On July 23, Gammino received a telephone call from Simeonoff who stated that because Brenda was enrolled in the Chugach Area Native Association, he believed that tribe would assume responsibility for Krystle.
After leaving a message for the Chugach Tribe on July 26, 1991, Gammino received a telephone call on July 29 from Jean Gannon of the Chugach association. She said that Krystle was a potential Indian child and she requested copies of the dependency information be sent to her for the Chugach corporate attorney. That day Gammino sent via Federal Express a copy of the jurisdiction/disposition report dated March 6, 1991, a social worker's report dated June 24, 1991, the service plan dated May 3, 1991, the petitions, and copies of the previous child protective services referrals for Krystle.
Around July 30, 1991, Gammino received a letter from Simeonoff dated July 24, 1991, which appeared intended for the BIA in Anchorage. It was a cover letter forwarding to the BIA the materials Gammino had sent to Simeonoff. Gammino mailed these materials and his own cover letter to the BIA requesting prompt attention to Krystle's matter.
After being advised by the BIA that Krystle's native association should be Kodiak, Gammino sent a letter to Joyce Constenius, a social worker for the Tribe, advising that the BIA had referred him to that tribe. He included the jurisdiction/disposition court report and order of dependency and requested "prompt action" with respect to the matter.
Shortly thereafter, Gammino received a certificate of Indian blood from the BIA showing that Krystle was one-eighth Aleut. Two days later, he decided that Krystle should not be placed with the proposed foster family, but that she should be placed consistent with any requests from the native association. Four days later, Constenius telephoned to request that Gammino not place Krystle in a regular foster home until she had time to review the court reports and discuss the matter with Simeonoff. She said she would let Gammino know what the association's degree of involvement would be. Gammino agreed to this request.
After being unable to contact Constenius by August 29, Gammino sent the Tribe a notice of the semiannual review scheduled for September 6, 1991. The notice was sent via certified mail.
About this time, Brenda left Santa Clara and returned to Seward, Alaska. Gammino placed Krystle in a temporary foster home pending advice from Constenius; and the semiannual review was continued to October 28 for additional information to be received from the association regarding Krystle's status or placement.
After calling the BIA office in Anchorage on October 11, 1991, to request information on Krystle's status, Gammino received a call on October 25 from Nan Smith of the BIA. She stated that Kodiak was not the correct association for Krystle because Brenda was enrolled in the Chugach association. Smith also recommended that Gammino contact the Kodiak and the North Pacific Rim associations because groups often covered for each other with respect to services and membership eligibility.
On October 28, 1991, Gammino reported to the juvenile court his attempts to discover Krystle's status and notify the tribes of the proceedings in the juvenile court.
After leaving a message with the North Pacific Rim Native Association on October 29, Gammino received a call on November 5 from its attorney who referred him back to the Chugach association.
On November 7, he called Jean Gannon at the Chugach association who wanted a letter explaining Krystle's situation and copies of court reports for their attorney to review. Gammino dispatched these materials on November 18.
On November 27, Gammino advised the court he was still waiting for information from the Chugach Tribe.
On December 17, 1991, Gannon called Gammino and stated that Krystle was a descendant of Chugach, but that the tribe would not intervene while the case was in reunification. It would intervene when permanency planning was in effect.
On December 24, the corporate attorney for the Chugach called Gammino to say that despite Krystle's Native American descent, they were not planning to pursue any legal action because the case was in reunification and considering Krystle's needs for services it was questionable whether they would intervene in the future. However, the case would be further assessed when and if permanent planning went into effect.
On January 9, 1992, Gammino called Gannon to confirm the Chugach association's intentions. He was again told the association would intervene when reunification services were terminated. He asked, but Gannon did not specify the nature of the intervention. She requested Gammino to continue providing information.
On February 3, 1992, the Department's court services unit sent notice of the February 28, 1992, hearing by certified mail. On February 27, 1992, Alaska social services worker Ron Newcome wrote Gammino stating that Brenda was not doing well in her treatment programs. He thought Krystle should not be placed in foster care in that area.
On March 24, the court services unit again sent the Chugach notice by certified mail of the hearing on selection of a permanent plan. On April 9, Marcia Standley, an adoptions supervisor, decided to contact the Chugach association to get placement information. On April 22, 1992, she spoke with Gannon. Gannon revealed that she was a distant relative of Brenda. Gannon supplied names and phone numbers of relatives who might be able to take Krystle, gave Standley the name of James La Belle, president of the Chugach association, and informed Standley that Brenda enrolled in the Kodiak association in December 1992 (sic).
On June 4, 1992, Gammino left a message for Gannon because he had no recent information. On June 19, Gammino telephoned La Belle to inform him of the permanency planning hearing (§ 366.26) scheduled for June 23. He inquired why neither Gannon nor anyone else from the association had responded to him or the notices for the hearings that had been sent. La Belle said he knew nothing of Krystle's situation but wanted to become actively involved in the case. He assured Gammino he would respond by the June 23 hearing date after he spoke with Gannon.
On July 22 the court services unit sent the Chugach association a notice via certified mail for the September 25 hearing.
On July 23, Gammino called La Belle again. La Belle said he had been dealing with other matters, but said he would now be able to direct his attention to Krystle. He requested that he and Gammino speak with his wife in a three-way conversation because she was a social worker. The La Belles then informed Gammino that Krystle's native association was Kodiak since it was Brenda's birth association. However, the villages of Woody Island and Ouzinkie should be noticed because Brenda's grandparents came from those villages. Gammino advised that the plan was to terminate parental rights and that Krystle needed a permanent placement. He pointed out that neither of the associations had provided a placement. Ms. La Belle indicated their plan would be to find a Native American home for Krystle within those two villages. Mr. La Belle offered to intervene in the court proceedings until it was determined which native village would become involved.
On August 3, 1992, Mr. La Belle called Gammino and stated that Herman Squartsoff of the Ouzinkie village wanted to be contacted. Gammino called and left a message.
On August 7, Constenius telephoned Gammino to say that Brenda had contacted an "IWA" worker who had in turn contacted her. Gammino outlined his numerous contacts with various associations. She requested Gammino to send reports to the Ouzinkie Tribal Council to Squartsoff's attention. Gammino said that the plan was to place Krystle in a permanent home for adoption. Constenius said there was a possibility that there were relatives in the Ouzinkie area who would want to care for Krystle.
On August 26, the court services unit sent notice via certified mail to the Kodiak Tribe, the Chugach Tribe, and the Ouzinkie Tribe advising of the permanency planning hearing then scheduled for September 25, 1992. The notice advised that the recommendation was to terminate parental rights. The notice stated that the tribes needed to advise the court of their desire to participate by September 25, 1992, or decisions would be made without their input.
On August 27 Gammino left Constenius a message that he was awaiting additional information from her.
On September 24, Constenius faxed a letter to Gammino stating that the Tribe was requesting an extension of time in this case. Because of this request, the matter was continued to October 7.
On October 1, 1992, Constenius told Gammino that there were numerous relatives in the Kodiak area and that she would contact him about possible placements before the next court date. On October 7, the matter was set on December 11, 1992, for a contested hearing on the permanency plan.
[3] Throughout the transcripts, Krystle's name is also spelled "Krystal"; we will refrain from correcting the numerous misspellings.
[4] Statutory references from this point are to 25 United States Code, unless otherwise indicated.
[5] Section 1912(a) provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner.... No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding."
[6] "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding." (§ 1911(c).) "`Indian custodian' means any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." (§ 1903(6).)
[7] "The Guidelines represent the Department of the Interior's interpretation of certain provisions of the Act; they were not intended to have binding legislative effect. [Citation.] However, the construction of a statute by the executive department charged with its administration is entitled to great weight. [Citations.]" (In re Junious M. (1983) 144 Cal. App.3d 786, 792, fn. 7 [193 Cal. Rptr. 40].)
[8] John also raises the issue of competence of his "court appointed counsel" in failing to file additional declarations in support of his first motion. In passing, we note that John's first counsel was retained. The record contains her declaration in support of an application for an order shortening time to file a motion for de facto status in which she declares that she was not retained until March 8, 1991. Second, the record shows that after the denial of John's motion, the matter was set for a six-month review. Two days before the hearing date, a minute order reads: "step-father motion withdrawn." The hearing date was also vacated. John does not provide an explanation of the withdrawal of his motion.
[9] There is no record in the clerk's transcript of the trial court appointing an attorney for John.