Filed 6/16/15  In re Mo. N. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Mo. N., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B260053 (Super. Ct. No. J069030) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY,<br><br>    Petitioner and Respondent,<br><br>v.<br><br> MATEO N.  and M. N.,<br><br>    Defendants and Appellants. | |

Mateo N. (father) and M. N. (mother) appeal from the juvenile court's order terminating parental rights to their daughter, Mo. N., and freeing Mo. for adoption. (Welf. & Inst. Code, § 366.26.)[1]  Appellants contend that Mo. is not adoptable and that the beneficial parent-child relationship exception bars the child's adoption.  (§ 366.26, subd. (c)(1)(B)(i).)  We affirm.

*Facts and Procedural History*

On August 30, 2012, Mo. (age 22 months) and three older siblings were placed in protective custody due to appellants' substance abuse, domestic violence, and reports that father was selling cocaine out of the home.  Mo. was anemic, had a bladder infection, suffered development delays, and her body weight and height was below the

_____
[1] All statutory references are to the Welfare & Institutions Code.

1

one percentile for infants her age. Mo. also exhibited aggressive behavior, hitting people, and pulling hair.

The trial court sustained a dependency petition for general neglect (§ 300, subd. (b)), ordered reunification services, and placed Mo. in foster care. In March 2013, Ventura County Human Services Agency (HSA) returned Mo. to mother's care for a 60-day extended visit. Services were extended but mother struggled with depression, was not taking her prescribed medication, was afraid to be on her own, and feared she would "self- sabotage" the case plan. Mother completed a drug rehabilitation program and a parenting program, but missed four random drug tests, stopped attending 12-step program meetings, and did not follow up on in-home therapeutic support services and a domestic violence program.

HSA removed Mo. a second time in January 2014, after mother tested positive for methamphetamine on two occasions (January 29, 2014 and January 31, 2014) and was arrested for being under the influence of a controlled substance. Mother admitted that she had been using methamphetamine since October 2013 and claimed that she suffered a relapse "due to stress" and "too much time on her hands." During a January 29, 2014 home visit, the social worker observed trash on the floor, dirty dishes and pans on the kitchen counter and stove top, and piles of laundry on the floor.

Father declined HSA's offer to take custody of Mo. and claimed that he was unable to care for Mo. due to his work schedule. When Mo. was placed in foster care, father was offered unsupervised visits but opted for supervised, one-day-a-week visits.

The trial court terminated mother's services on February 27, 2014, and continued services for father. (§ 387.) At the 18-month review hearing, the trial court terminated services for father and set the matter for a permanent placement hearing. Following a contested section 366.26 hearing, the court found that Mo. was adoptable and that the parent-child and sibling relationship exceptions did not apply. (§ 366.26, subd. (c)(1)(B)(i) & (v).)

*Adoptability*

2

Appellants contend that the evidence does not support the finding that Mo. is adoptable. Before terminating parental rights, the juvenile court must find by clear and convincing evidence that the child is likely to be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406.) In assessing a child's adoptability, " 'the juvenile court must focus on the child, and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.] In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]' [Citations.] We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. [Citation.]" (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562.)

` The section 366.26 report states that the prospective adoptive parents love Mo. and want to adopt and make her a permanent member of the family. Mo. is an adorable toddler, has become more socialized in her behavior, and responded well to therapy. Appellants argue, for the first time on appeal, that Mo. suffers from reactive attachment disorder, i.e., attachment difficulties with her caregivers.[2] Although no one reported that Mo. suffered from reactive attachment disorder, the social worker did testify that Mo. had attachment problems in the past.

Father argues that the bonding problem is significant and that Mo. will need lifelong therapy. That misstates the evidence. Social worker Davi Barroso testified that Mo. will have phases in her life where "she's going to need support around issues of

---

[2] " 'Reactive attachment disorder' " is a psychological condition that means an inability to form loving attachments. It entails difficulty bonding, poor impulse control, and insensitivity to the needs of others. [Citations.]" (*In re Jayson T.* (2002) 97 Cal.App.4th 75, 82.) The disorder, while related to having inadequate care and multiple caregivers prior to placement in foster care, is further exacerbated by the lack of permanent placement in a stable, nurturing and supporting home. (*In re Krystle D.* (1994) 30 Cal.App.4th 1778, 1792.)

adoption and attachment . . . ." Mo. had difficulty adjusting to her foster home but was doing much better and bonding to her fost-adopt parents. When Mo. started to "overly" attach by befriending strangers, HSA referred Mo. and the fost-adopt parents to the Ventura County Behavioral Health Subsystem for in-home therapeutic services.

In an August 4, 2014 report, HSA reported that Mo. was responding to therapy and able to transition between visitation and the prospective adoptive home. "Mo. no longer cries, easily returns to the care of the prospective adoptive parents after visits, and shows excitement when returning home. Mo. continues to demonstrate increased attachment to her prospective adoptive family and is responsive to the stability and structure in the home."

The evidence clearly shows that Mo. is healthy and adoptable. Social worker Barroso explained that Mo. "is having some adjustment issues, but those are in progress . . . . She will have phases in her life where she's going to need support around issues of adoption and attachment and -- but Mo. is not reactive attachment. She's not behaviorally beyond the scope of adoption,"

Appellants argue that Barroso, a social worker with 17 years experience, was not qualified to opine on whether Mo. suffered from reactive attachment disorder. Appellants, however, did not object and are precluded from challenging the testimony on appeal. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 502; *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 222.) Father argues that Barroso should have ascertained Mo.'s feelings about adoption but Mo. was only three years old. The trial court credited Barroso's report that Mo. "is too young to understand the concept of adoption. . . Mo. does demonstrate positive connections with her prospective adoptive parents and siblings." Where, as here, the child is too young to understand or express his/her wishes regarding adoption, there is no requirement that the trial court obtain a statement from the child about placement and adoption. (§ 366.21, subd. (i)(1)(E); *In re Juan H.* (1992) 11 Cal.App.4th 169, 173.)

Substantial evidence supports the trial court's finding that Mo. is adoptable and likely to be adopted within a reasonable time. The section 366.26 report states that

Mo. is adoptable and "there is no reason to believe that the prospective adoptive parents will not follow through with the adoption finalization of Mo.. . . . There are families that are also approved adoptive families that would accept a child of Mo.'s age, ethnicity, parental background and similar individual traits."

" ' "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" '  [Citation.]"  (*In re Gregory A.*, *supra*, 126 Cal.App.4th at p. 1562; see also *In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

*Beneficial Parent-Child Relationship*

Appellants argue that the trial court erred in finding that that the benefits of continuing the parent-child relationship do not outweigh the benefits of adoption.  (See e.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  The parent-child relationship exception to adoption is reviewed under a hybrid substantial evidence and abuse of discretion standard.  (*Id.*, at p. 1314.)  "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will chose a permanent plan other than adoption. [Citation.]"  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

To establish the beneficial parent-child relationship exception, appellants must show they maintained regular visitation with Mo..  (§ 366.26, subd. (c)(1)(B)(i).)  Once that has been established, the burden is on appellants to demonstrate that Mo. would benefit from continuing the relationship and that it outweighs the benefits of adoption.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  It is a two prong test. "The exception applies only where the [trial] court finds regular visits and contact have

continued or developed a significant, positive, emotional attachment from child to parent.' " (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)

The trial court found that appellants met the first prong by maintaining regular visitation but visitation was minimal after mother suffered a drug relapse. Father was offered two to three unsupervised visits a week for six hours each, but opted for one-hour per week supervised visits at the HSA office. Father claimed that he was too busy with work and that no other family members were available to care for Mo.. Father was given the chance to demonstrate day-to-day parenting but declined to take on the responsibility of unsupervised visits.

With respect to the second prong, the trial court found that appellants maintained a "visiting relationship" but that appellants' love and affection did not outweigh the benefits of adoption. Mo. lived with appellants for the first 22 months of her life, was in foster care for eight months, and returned to live with mother and/or father until mother suffered a drug relapse nine months later. Mo. lived with her fost-adopt parents for the next 10 months and looked to them for comfort and support. By the time of the section 366.26 hearing, Mo. had spent a quarter of her life outside of appellants' care.

Mother stated that Mo. enjoyed the visits and was happy but mother never advanced beyond supervised visitation. While Mo. had a good relationship with mother, it was more as a friend and playmate than as a parent. (See e.g., *In re Brittany C.* (1999) 76 Cal.App.4th 847, 854.) The parent must show "more than frequent and loving contact, an emotional bond with the child, or pleasant visits. [Citation.]" (*In re Dakota H., supra,* 132 Cal.App.4th at p. 229.)

The trial court found "there is evidence of a relationship for Mo. and her father and some -- to some lesser degree, her mother, because of the regular contact and parental work that father did during this case for an approximate nine-month period. But then, unfortunately, it took substantial steps backwards back to a visiting relationship" after mother suffered the drug relapse.

6

Mo.'s contact with father was limited to one hour a week supervised visits. Social worker Barroso agreed "there's probably a bond" between Mo. and father but stated that the "bond is questionable" because of father's history of domestic violence. Children from domestic violence homes are not "able to trust that they're going to be taken care of or that they're going to be safe." Mo. exhibited those problems when she tantrumed, had difficulties sleeping, and hit and pulled hair. The behavioral problems subsided after Mo. was placed with her prospective adoptive parents and received therapy. Over time, Mo. viewed the supervised visits as play, easily transitioned, and was excited to return home to her foster parents. When asked whether Mo. was sad at the end of the visits, father conceded "[n]ot very much. At the beginning, yes, but not now -- not much." Appellants presented no evidence that "severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.]" *In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Father argues that the trial court erred in considering the fost-adopt family's willingness to allow post-adoption visits with family members. Although the section 366.26 report indicated that the fost-adopt parents were open to visits, the trial court stated: "It's not a factor that I'm basing my decision on . . . ." The court acknowledged that appellants love Mo., but "[s]adly, this case cries out for the security, stability and comfort that [only] permanency can afford this child."

Based on Mo.'s age and needs, the trial court reasonably concluded that Mo.'s long-term emotional interests would be better served by the permanency of adoption. (See e.g., *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1013.) It was "a 'quintessentially' discretionary decision" but not a close call. (*In re Bailey J.¸ supra,* 189 Cal.App.4th at p. 1315.) Adoption is the preferred permanent plan and is clearly in Mo.'s best interests. It is not our function to retry the case. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) "The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the

7

time the child needs it, not when the parent is ready to give it."  (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.)

The judgment (section 366.26 order terminating parental rights) is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

8

Bruce Young, Judge

Superior Court County of Ventura

_____

Aida Aslanian, under appointment by the Court of Appeal, for Mateo N., Appellant

Maureen L. Kearney, under appointment by the Court of Appeal, for M. M., Appellant.

LeRoy Smith, County Counsel, County of Ventura and Joseph J. Randazzo, Assistant County Counsel, for Respondent.