Filed 2/18/16  In re Amy J. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Amy J., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES, Plaintiff and Respondent, v. Amy J., Defendant and Appellant | A145782 (Humboldt County Super. Ct. No. JV140103) |

Amy J., an Indian child and dependent of the Humboldt County juvenile court pursuant to Welfare and Institutions Code section 300,[1] appeals from that court's order authorizing respondent Humboldt County Department of Health & Human Services (Department) to place her as requested by her Indian tribe with a Butte County family that was caring for, and in the process of adopting, her sister.  Amy, one year old when the court issued its order, was bonded and thriving with Humboldt County foster/de facto parents who had cared for her since she was two days old and wanted to adopt her.  Amy argues the order must be reversed for three reasons:  (1) regardless of the court's characterization of it as a foster care placement order, it was in fact an order for her adoptive placement and, as such, violated the Indian Child Welfare Act (ICWA) adoptive

---

[1]  Statutory references herein are to the Welfare and Institutions Code unless stated otherwise.

placement preferences; (2) even if construed as a foster care placement order, it should not have issued because there was no tribal resolution and because Amy showed good cause to deviate from the ICWA foster care placement preferences; and (3) the order violated Amy's constitutional liberty interest in her family relationship with her Humboldt County foster/de facto parents.

We conclude the court's order was not for adoptive placement, but instead authorized a change in Amy's foster care placement, and that Amy does not establish the court erred in issuing it. Therefore, we affirm the order.

## BACKGROUND

### I.

### *Events Leading Up to the Department's Petition*

Prior to this case, Amy's mother, Mariah M. (mother), lived in Butte County. Butte County Child Welfare removed her infant daughter, Samantha, from her custody and she and Samantha's father, Kristofer R., lost reunification services.

At some point, mother moved to Humboldt County. On July 12, 2014, she gave birth to Amy. Two days later, the Department removed Amy from her custody for several reasons, including mother's positive test for marijuana,[2] Samantha's previous removal, mother's lack of plans to care for Amy and mother's apparent, untreated mental health issues. Amy was placed with foster parents Julia R. and Tracy R. in Humboldt County.

### II.

### *The Department's Petition and the Subsequent Jurisdiction and Disposition Orders*

The Department filed a section 300 petition alleging dangers to Amy because of the inability of mother and Amy's apparent father, also Kristofer R., to care for her. We summarize only those aspects of the proceedings that are relevant to our resolution of this appeal.

---

[2] It was also reported to the Department that Amy tested positive for marijuana at birth, but the Department found no record of such a test.

Mother, represented by counsel, filed a waiver of rights and submitted on the basis of the Department's jurisdiction report. Kristofer R. was assigned counsel and sought a paternity test. He otherwise did not participate in any of the proceedings relevant to this appeal.

The court sustained the Department's petition as amended. It found Amy to be a child described by section 300, subdivision (b) in that she faced a substantial risk of harm because of her parents' failure to adequately care for her, and mother's untreated mental issues, developmental and cognitive status, homelessness, lack of supplies and plan for Amy's care and substance abuse problems. The court also found Amy to be a child described in section 300, subdivision (j) in that Samantha's abuse or neglect indicated there was a substantial risk Amy would be abused or neglected as well, because mother and Kristofer R. had Samantha removed from their care, and because Kristofer R. had failed reunification services, had a history of ongoing substance abuse and had not fully completed treatment.

The parties agree that Amy is an "Indian child" subject to the Indian Child Welfare Act (ICWA).[3] During the proceedings, mother indicated she was affiliated with the Klamath and Hoopa Valley tribes, and Kristofer R. indicated he was affiliated with the Cherokee Nation. The Department ultimately sent ICWA notice of the proceedings to each tribe.[4] Soon after the proceedings began, in August 2014, a child welfare specialist of the Klamath Tribes in Chiloquin, Oregon (Tribe), Lisa Ruiz, wrote to the Department

---

[3] An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) Mother filed a notice with the court that she was or might be a member, or eligible for membership in, the Klamath Tribes of Oregon. In its jurisdiction report, the Department stated that mother and maternal grandmother indicated they were "affiliated" with the Klamath Tribes of Oregon, among others. In its jurisdiction report, the Department asserted that Amy was an "Indian child" of the Tribe.

[4] Early in the proceedings, notice was not sent to the Hoopa tribe, although it was entitled to notice pursuant to ICWA. This was corrected prior to those parts of the proceedings that are relevant to this appeal. None of the parties raise any ICWA notice issues.

that Amy was eligible for enrollment in the Tribe.[5]  It was the only tribe that did so; and Ruiz also stated the Tribe would intervene in the case.

For a November 2014 disposition hearing, the juvenile court accepted mother's waivers of her appearance and of reunification services.  The court ordered that neither mother nor Kristofer R., designated the alleged father, would be provided any reunification services, declared Amy a dependent of the court with her care, custody and control vested in the Department, and scheduled pre-trial, section 366.26 permanent plan and post permanency plan review hearings.  As recommended by the Department, the court found the appropriate permanent plan for Amy was a legal guardianship, which the Department would finalize by the end of 2015.

### III.

### *ICWA Issues and the Foster Parents' Interest in Adopting Amy*

In January 2015, the court granted the request of Amy's foster parents, Julia and Tracy, that they be declared Amy's de facto parents.

At a March 2015 pretrial hearing, the Department asked the court to reset the section 366.26 hearing so it could give notice that it had changed its permanent plan recommendation to adoption and present an ICWA expert in support of this plan.  The court did so.  The Department's counsel also said there was discussion about transferring Amy's case to Butte County so she could be placed with her sister.  Minor's counsel tentatively opposed this request because he thought Amy's best interest was to stay in Humboldt County.

On April 1, 2015, the court granted Julia and Tracy's request that they also be designated Amy's prospective adoptive parents, but struck this order the next day after the Department contended the court could do so only after it completed a section 366.26 hearing and terminated parental rights.  Also, the court, as requested by the Department

---

[5]  In March 2015, father's counsel told the court father was in the process of getting himself and Amy enrolled in the Cherokee Tribe and that the Cherokee Tribe wished to intervene with the enrolling of the child.

4

because of its concern about ICWA notice requirements, vacated all hearing dates and set a post permanency plan review hearing for June 4, 2015.

## IV.

### *The Post Permanency Plan Review Hearing*

For the June 4, 2015 post permanency plan hearing, the Department reported that Amy was bonded and continued to "thrive" with Julia and Tracy, who sought designation as prospective adoptive parents. The Tribe's child welfare specialist, Lisa Ruiz, while aware of this bond, had informed the Department the Tribe was intervening and wanted Amy placed with Samantha in Butte County so the two sisters could have the opportunity to grow up together. The Department agreed that Amy should be placed with her sister despite Julia and Tracy's opposition and was arranging visitation between the two sisters. It recommended the court schedule a section 366.26 hearing and order that the Department was authorized to place Amy with her sister in Butte County. It also stated that it had changed its recommendation from guardianship to adoption after collaboration with, among others, the Tribe.

At the June 4, 2015 hearing, the court found the appropriate permanent plan for Amy was adoption, which plan the Department was likely to finalize by June 29, 2016. At Amy's counsel's request, the court reserved for a contested hearing whether to authorize the Department to place Amy out of county.

# V.

## *The Contested Placement Hearing*

### A. *The Department's At-Issue Memorandum*

In its at-issue memorandum for the contested placement hearing, the Department recommended that Amy be placed with her sister in Butte County in accordance with ICWA foster care placement preferences outlined in 25 U.S.C. section 1915(b) and Welfare and Institutions Code section 361.31, subdivision (b). It based its recommendation on the Tribe's preference and the fact that neither of Amy's parents lived in Humboldt County, that placement in Butte County would put Amy near her father in accordance with ICWA's placement preferences and that Amy's foster parents did not qualify as extended family members under state or federal law. The Department argued that Amy could not meet her burden of showing by clear and convincing evidence that there was good cause to deviate from the Tribe's preference in light of the benefit to Amy of being raised with her sister.

The Department also filed an addendum report in which it added that the Tribe wanted Amy's "adoptive home" to be with her full sibling, who was in the process of being adopted by a family that had previously adopted and was approved for adoption homestudy. The Department also reported that its foster care placement social worker, Janet Wood, "recently discovered that [Julia] has historical child welfare history regarding her biological children surrounding her ability to supervise and protect her children from sexual abuse," which history Julia "failed to disclose . . . to the Department when the home became initially licensed." The Department recommended again that Amy be placed with her sister in Butte County.

**B.** *The Testimony Presented at the Contested Placement Hearing*

**1.** *Julia's Testimony*

Julia testified at the contested placement hearing, which commenced on July 6, 2015, that Amy had recently started calling her "Momma." Julia wanted to adopt Amy and told the Department this when Amy was three months old. Around that same time, the Department discussed placing Amy with Amy's sister, but had been "wishy-washy" about whether to do so. Amy had yet to meet her sister and the Department had made no effort to arrange a visit between them. Julia was willing to take Amy to meet her sister in Butte County and be her sister's foster parent. She understood Amy was subject to ICWA and that her tribe had input into her permanent plan.

Asked about her own child welfare history, Julia said that years ago she placed her toddler son (he was 25 at the time of the hearing) with a county-recommended child care provider. After concluding he was being inappropriately touched there based on changes in his behavior, she removed him from the provider's care, arranged therapy for him and stopped working to stay home with him. Child welfare services came to her home at the time and briefly investigated. She did not refer to this incident in her foster parent license application because no question called for it.

**2.** *Department Social Worker Donnie Sanches's Testimony*

The department social worker responsible for Amy's case, Donnie Sanches, testified that Julia and Tracy were meeting all of Amy's needs and had bonded with her. Sanches acknowledged stating in a February 2015 report to the court that the Tribe preferred that the two girls be placed together with Samantha's present provider *or* that Amy remain in her current placement and the girls have a relationship. However, since then, Ruiz had stated that the Tribe wanted the girls placed together. Sanches had not discussed with the Tribe whether it would agree to the girls being placed together in Amy's current placement. Sanches had been communicating monthly with the Tribe, and Ruiz had recently stated that it planned to intervene. Sanches was not aware of any tribal resolutions about Amy's case.

7

Sanches also testified that she had previously told Amy's foster parents that she thought Amy should remain in Humboldt County because her family and culture were there. However, Sanches had changed her mind because Amy's mother could be hospitalized for a long time and might not return, other of Amy's family members had a difficult time remaining sober, and Amy's maternal grandmother had substance abuse issues and was undecided about whether to remain in Humboldt County. Sanches understood Tracy was Amy's mother's distant cousin, but the Department thought it was in Amy's best interests to be raised with her sister because of research showing the importance of such a lifelong relationship. Sanches understood Amy might be traumatized by her removal from her foster parents' home, but also understood that children who formed healthy bonds early on were able to re-form that bond. The two sisters had not yet met.

Sanches said she had recently learned that Julia had neglected to list a previous child welfare referral in her initial foster parent licensing paperwork. Sanches understood the referral was regarding a possible sexual abuse by someone else towards Julia's son.

### 3. *Tracy's Testimony*

Tracy, one of Amy's foster/de facto parents, testified. He said he was related to Amy because he was her mother's second cousin, apparently by the marriage of his aunt and her husband. He loved Amy like a daughter. She looked to him for protection and comfort, and also had daily relationships with Julia's parents and Tracy's daughter. Sanches had told him a half a dozen times that she thought in her heart that Amy should stay with them.

Tracy wanted Amy to stay with him and Julia, and was willing to foster a relationship between Amy and her sister and take the sister into their home. He and Julia were recently licensed to have two foster children because of their interest in the sister living with them.

### 4. *Physician Assistant Heather Kyte's Testimony*

Heather Kyte, Amy's physician assistant, testified that she examined Amy four times since Amy was two months old. Amy was healthy and Kyte had no concerns about Julia and Tracy's care of her.

Kyte said she wrote a letter in May 2015 stating that Julia and Amy were very responsive to each other, Julia was a very caring caregiver and the two appeared to have a "wonderful" bond. Kyte was concerned that Amy would be taken from a caregiver with whom she had "a very strong psychological bond" because early childhood bonding with a parental figure is very important for a child's development and health. However, she was not aware that Amy had a full-blooded sibling.

### 5. *Department Placement Coordinator Janet Wood's Testimony*

Janet Wood, a placement coordinator for the Department's child welfare services, testified that while she had some initial concerns about placing Amy with Julia and Tracy because of Julia's nervousness, she did so because the placement was for short-term foster care and the couple was not interested in adoption. At the time, she told Julia "that Amy had a full-blooded sibling that lived in Butte County and that would probably be the identified plan by the Department if reunification was not successful, and that [Amy] was also Native American so adoption may not be an option." The couple did not indicate they were related to Amy, had a tribal affiliation or had a child welfare history.

Wood had reviewed some recently discovered child welfare files for referrals involving Julia[6] in 1996 and 1997, which were related, and another in 1999. Regarding the 1996 referral, Wood knew only that it was for sexual abuse. She understood the alleged sexual abuse perpetrator in 1997 was Julia's son and that Julia was told this at the time. Based on this recently discovered history, a process had begun to determine whether to de-license Julia and Tracy as foster parents and Wood had concerns about their ability to adopt Amy.

---

[6] Julia had a different last name in the late1990s.

**6. *The Parties' Arguments***

After evidence was presented, Amy's counsel argued against changing Amy's placement because the Tribe had not yet formally intervened nor submitted anything in writing on the issue, and because it was against Amy's interests to disrupt her bond with Julia and Tracy. The sibling connection was an important one, but Amy and her sister had not met and Julia and Tracy were more than willing to facilitate that contact and foster the sister. And although Amy was not eligible for admission into the Hoopa tribe, she had family in Hoopa that were eligible; she also had a connection to Hoopa culture in the county. Also, there was no information about the other placement. Amy's counsel suggested the court order a visitation schedule for the girls and, as they developed a relationship, determine whether to place them together in one or the other of the foster homes. As for Amy's foster parents' purported child welfare history, they had not done anything wrong.

Tracy addressed the court as Amy's de facto parent. He emphasized his and Julia's connection with Amy, their desire to keep her in their home and expose her to Hoopa culture, and willingness to further her relationship with her sister.

The Department's counsel referred to the Department's pretrial written legal analysis. He said Amy, as an ICWA child, was currently being enrolled in the Tribe. The Tribe, he argued, should not be penalized as an out-of-state tribe that was "not able to fully participate in the way that we expect a lot of our more localized tribes" and that this "does not mean that ICWA just somehow stops applying." At every step in the proceeding, the Tribe had been notified and consulted, and it had been very clear and consistent about its preference for Amy's permanent planning. Her long-term relationship with a full sibling was more important than any short-term detriment she might experience being moved.

Also, the Department's counsel argued, there were inconsistencies in Amy's foster parents' reporting that raised "serious concerns" about their adoption of Amy if the Tribe would allow it. On the other hand, Amy's sibling's home had already been approved for adoption and there was probably no question it would be approved again. Further, Amy

did not have extended biological family in Humboldt County other than her dysfunctional grandmother, the Hoopa tribe was not Amy's tribe nor were her foster parents members of it, and Amy's alleged father's biological family was in Butte County.

Mother's counsel said mother was in a Los Angeles hospital being rehabilitated for trial in Butte County. Based on his last contact with her, he thought she preferred that Amy be safe, have some connection to her family and be where mother might have access to her if mother "resurface[d]," such as via the maternal grandmother. Therefore, mother's counsel agreed with minor's counsel's position.

### 7. *The Juvenile Court's Ruling*

The juvenile court ruled from the bench after closing argument. It stated that Amy was an Indian child eligible for enrollment in the Tribe, which was entitled to intervene in the proceedings. The Tribe had indicated their placement preference. The court, pursuant to section 224, subdivision (b), was required to strive to promote the stability and security of Indian tribes and families, comply with ICWA, and protect Amy's best interests. Any removal of an Indian child from foster care, guardianship or adoptive placement for the purpose of further foster care, guardianship or adoptive placement had to be done in accordance with ICWA. The court did not think the Tribe needed to formally intervene in order for ICWA to apply to Amy once she was determined to be an Indian child. Focusing on state law, apparently section 361.31 (governing foster care placements and adoptive placements for Indian children), the court reviewed the order of adoptive placement preferences and concluded that it was "quite obvious that the intention is to maintain tribal family relations and relationships." The court then stated that it had no good reason to believe that extended family members did not include siblings. Accordingly, it concluded that ICWA was applicable and Amy's placement with extended family—her sister in Butte County—was a priority under it.

The court stated as additional reasons for its decision that Amy's sister's family had been approved for adoption for two children, Amy's father was in the area of her sister's home and Amy's extended family had only tenuous relations to Humboldt County. Also, there was an issue of whether Amy's foster parents could be approved for

11

adoption in light of their child welfare history, which indicated that their son may have been acting out "in a sexual type of manner," and the court was not clear that the issue "was ever dealt with." The court thought Julia might have been somewhat "duplicitous when she neglected to advise [child welfare services] of earlier Child Welfare matters." Finally, whether Samantha could join Amy in Amy's foster home was "a speculative discussion at best." For all of these reasons, the juvenile court granted the Department's request and ordered that Amy could be placed with her sister in Butte County.

Amy's counsel subsequently filed a timely notice of appeal on Amy's behalf from the juvenile court's July 14, 2015 order. Amy points out that the juvenile court subsequently issued a written order after hearing on July 31, 2015, stating that "the Court authorizes placement of the child in a suitable foster care home, in or out of county. The Court finds the placement necessary and appropriate."[7]

During the pendency of this appeal, the Department requested that we take judicial notice of a Department report to the court filed on August 25, 2015, after Amy filed her notice of appeal and moved that we make certain factual determinations based on this document. The Department's requests were related to questions involved in Amy's petition for a writ of supersedeas. We subsequently denied this petition. We hereby deny the Department's request for judicial notice and motion as well.

## DISCUSSION

Amy argues that we must reverse the juvenile court's order because: (1) it was for an adoptive rather than a foster care placement and, as such, was in violation of ICWA adoptive placement preferences; (2) even if for a foster care placement, it was not supported by a tribal resolution and Amy established good cause to override the Tribe's preference; and (3) it impermissibly infringed on her constitutionally protected liberty interest in her family relationship with Julia and Tracy. We disagree with each argument.

---

[7] The court's written order is contained in Amy's petition for a writ of supersedeas rather than in the appellate record. We construe Amy's reference to it as a request that we take judicial notice of it, which we do pursuant to Evidence Code section 452, subdivision (d).

12

# I.

## *ICWA and Related State Law*

As this court has discussed, "ICWA was 'the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 701 (*Autumn K.*).) It "establishes procedural and substantive standards governing the removal of Indian children from their families." (*Id*. at p. 702.)

Nonetheless as stated in *Autumn K.*, "application of ICWA's provisions was often inconsistent and perfunctory in California. (Cal. Judges Benchguide: The Indian Child Welfare Act (2012) p. 9; see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended Aug. 22, 2005, p. 6 . . . ). As a result, in 2006, the California Legislature adopted Senate Bill No. 678 (2005–2006 Reg. Sess.) (Senate Bill 678), which incorporated ICWA's requirements into California statutory law, revising several provisions of the Family, Probate, and Welfare and Institutions Codes. [Citations.] According to the Assembly Judiciary Committee, the goal of Senate Bill 678 was to ensure compliance with ICWA requirements in order to foster Indian children's connection with their tribal heritage. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 678, *supra*, as amended June 14, 2006.) And per the Senate Rules Committee, the bill 'revises and recasts' provisions of state law 'by codifying into state law various provisions of [ICWA], [BIA] Guidelines for State Courts, and state Rules of Court' and 'affirms the state's interest in protecting Indian children and the child's interest in having tribal membership and a connection to the tribal community.' (Sen. Rules Com., Off. of Sen. Floor Analysis, Unfinished Business Analyses of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended Aug. 21, 2006, p. 1.)

"Among many other provisions, Senate Bill 678 added section 224 to the Welfare and Institutions Code, setting forth the following legislative findings and declarations:

" '(a) . . . [¶] (1) There is no resource that is more vital to the continued existence

and integrity of Indian tribes than their children, and the State of California has an interest in protecting Indian children who are members of, or are eligible for membership in, an Indian tribe. The state is committed to protecting the essential tribal relations and best interest of an Indian child by promoting practices, in accordance with the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.) and other applicable law, designed to prevent the child's involuntary out-of-home placement and, whenever that placement is necessary or ordered, by placing the child, whenever possible, in a placement that reflects the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the child's tribe and tribal community.

" '(2) It is in the interest of an Indian child that the child's membership in the child's Indian tribe and connection to the tribal community be encouraged and protected, regardless of whether the child is in the physical custody of an Indian parent or Indian custodian at the commencement of a child custody proceeding, the parental rights of the child's parents have been terminated, or where the child has resided or been domiciled.

" '(b) In all Indian child custody proceedings, as defined in the federal Indian Child Welfare Act the court shall consider all of the findings contained in subdivision (a), strive to promote the stability and security of Indian tribes and families, comply with the federal Indian Child Welfare Act, and seek to protect the best interest of the child. Whenever an Indian child is removed from a foster care home or institution, guardianship, or adoptive placement for the purpose of further foster care, guardianship, or adoptive placement, placement of the child shall be in accordance with the Indian Child Welfare Act.' " (*Autumn K.*, *supra*, 224 Cal.App.4th at pp. 703–705.)

Senate Bill 678 also added certain other provisions to the Welfare and Institutions Code. Of particular importance here is section 361.31. It outlines foster care placement and adoptive placement preferences for an Indian child (§ 361.31, subds. (b) and (c) respectively) similar to ICWA (25 U.S.C. § 1915(a), (b)), which we will discuss further in the course of reviewing Amy's contentions.

14

### *The Court's Order Was Not for Adoptive Placement.*

Amy first argues that, although the juvenile court characterized its order as authorizing a change in Amy's *foster care* placement, we must construe it as ordering Amy's *adoptive* placement pursuant to ICWA.

Amy's argument is unpersuasive. The juvenile court's order was a foster care placement decision. The Department's at-issue memorandum requested authority to change Amy's foster care placement to a placement with her sister outside the county. At the contested placement hearing, the court, in announcing its ruling, referred to adoptive placement, but did not order an adoptive placement and made clear in its written order that it was authorizing a foster care placement only. Amy also fails to explain why the juvenile court would have made an adoptive placement decision before holding its scheduled section 366.26 hearing and terminating parental rights.

Amy argues that under ICWA, the definition of "foster care placement" does not include a child's move from one foster care placement to another. Rather, its scope is limited to "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." (25 U.S.C. § 1903(1)(i).) Assuming she is correct in her interpretation of this federal definition, it has not been incorporated into our state law. To the contrary, California Rules of Court mandate that our juvenile courts' foster placement preferences *are* subject to the foster care placement preferences outlined in section 361.31, subdivision (b). California Rules of Court, rule 5.482(f) specifically states: "Whenever an Indian child is removed from a guardian, conservator, other custodian, foster home, or institution for placement with a different guardian, conservator, custodian, foster home, institution, or preadoptive or adoptive home, the placement must comply with the placement preferences and standards specified in Welfare and Institutions Code section 361.31." To the extent our state law provides greater protection for an Indian child, it controls. (§ 224, subd. (d) ["In any case

15

in which [the Welfare and Institutions Code] or other applicable state or federal law provides a higher standard of protection to the rights of . . . an Indian child, . . . than the rights provided under [ICWA], the court shall apply the higher standard"].)

Amy also contends that "[t]here is no provision in the ICWA for removing a minor from an ongoing [foster] placement merely because the tribe would like to see the minor placed elsewhere," citing *In re Krystle D.* (1994) 30 Cal.App.4th 1778 (*Krystle D.*).  In *Krystle D.*, a social worker spent two years engaging in "more than 30 unfruitful contacts" with certain possible tribes of a dependent child.  (*Id.* at p. 1788 & fn. 2.)  The tribes responded fitfully, gave the social worker conflicting information and did not intervene in the child's case.  (*Id.* at pp. 1788–1790, fn. 2.)  During these two years, the social worker changed the child's foster care placement.  (*Id.* at pp. 1792–1793.)  One of the tribes then intervened, a section 366.26 hearing was held, parental rights were terminated and the child was placed in a home pursuant to ICWA adoptive placement preferences.  (*Id.* at pp. 1794–1795.)

The child's mother appealed.  Among other things, she argued that federal ICWA statutes required that before an Indian child's foster care placement could be changed, a hearing had to be held and the parents and the child's tribe had to be given notice.  (*Krystle D.*, *supra*, 30 Cal.App.4th at p. 1804.)  The *Krystle D.* court rejected her argument, noting that the mother was a party represented by counsel throughout, and that the tribe had actual notice of the proceedings and did not intervene for some time while the child was seriously deteriorating.  The court concluded that "no policy in the [ICWA] countenances inexplicable and unjustified delays in tribal responses at the expense of serious trauma to a small child whose future life is at the core of the issue."  (*Ibid.*)

The *Krystle D.* court added that the mother appeared to be asserting that the social worker should not have moved the child from one foster home to another without input from the mother and the tribe.  The court rejected this argument because "[n]either the Act nor the Welfare and Institutions Code gives the parent or [t]ribe the authority to select the foster home of a dependent of the juvenile court.  No right . . . was violated by

16

[the social worker's] management of [the child's] interim placements." (*Krystle D.*, *supra*, 30 Cal.App.4th at p. 1805.)

Amy's reliance on *Krystle D.* is curious because it does not support her argument that we must treat the court's order as determining her adoptive placement, since the *Krystle D.* placements at issue were interim foster care placements. That said, the case is inapposite for several reasons. First, the *Krystle D.* social worker apparently made the interim foster care placement changes within the authority already granted by the court; here, the court was asked to decide whether to authorize Amy's placement out of the county for the first time. Second, in *Krystle D.*, no tribe had claimed responsibility for the child or stated any placement preferences when her foster care placement was changed; here, the Tribe stated unequivocally that Amy was eligible for membership in it, stated that it would intervene, and stated a placement preference. Thus, *Krystle D.*'s circumstances are too inapposite to provide any meaningful guidance here.[8]

Amy also relies on *In re Alexandria P.* (2014) 228 Cal.App.4th 1322 (*Alexandria P.*) to contend that the juvenile court, regardless of its own characterization of its ruling, ordered an adoptive placement. In *Alexandria P.*, an infant Indian child was taken away from her mother, who was denied reunification services; her father's tribe then consented to the child's placement with a non-Indian foster family to facilitate reunification with her father. (*Id.* at pp. 1328, 1333.) The child was eventually placed with a foster family with which she thrived for two and a half years. (*Id.* at pp. 1328, 1330.)

---

[8] In any event, Amy's argument is not that *Krystle D.* requires that we interpret her placement to be an adoptive one, but that it stands for the proposition the juvenile court did not need to conduct a hearing or follow ICWA placements to authorize Amy's foster placement out of the county (and, therefore, by doing so it must have been ordering an adoptive placement). Even if this were the case, the court's order was based in part on its view of Amy's best interests, its concerns about one of Amy's foster/de facto parent's child welfare history and the benefit to Amy of being placed with her sister in a family that was approved for adoption. Therefore, it appears the court would have approved the Department's request even if it did not need to consider ICWA and state law foster care placement preferences.

The juvenile court terminated reunification services for the father and scheduled a section 366.26 hearing.  (*Alexandria P.*, *supra*, 228 Cal.App.4th at pp. 1333–1334.)  At the request of the social services agency, the court issued a request for the child's expedited placement with the father's extended family in Utah pursuant to the Interstate Compact on the Placement of Children (ICPC), Family Code section 7900 et seq., which request the father supported.  (*Alexandria P.*, at pp. 1328–1329, 1332, 1334.)  Over the next approximately eight months, events included the court's granting de facto parent status to the foster family, approval of the ICPC request permitting the child's placement in Utah and the parties' submission of briefs addressing whether good cause existed to depart from ICWA's adoptive placement preferences.  (*Id.* at p. 1334.)  The court then held a hearing on whether the proposed placement complied with ICWA's adoptive placement preferences; four months later it ordered the child placed in Utah.  (*Id.* at pp. 1334–1335.)

*Alexandria P.* is of no help to Amy here for several reasons.  Its discussion does not indicate whether or not the scheduled section 366.26 hearing occurred or if father's parental rights were terminated before the court ordered the child placed in Utah.[9]  Regardless, whether the child's placement in Utah was subject to ICWA adoptive placement preferences before a section 366.26 hearing was completed and parental rights terminated was never at issue.  Cases are not authority for propositions not considered or decided by the court.  (*People v. Scheid* (1997) 16 Cal.4th 1, 17.)  Even assuming  the section 366.26 hearing did not occur, the case involved inapposite circumstances, i.e., the placement of a child out of state pursuant to an expedited ICPC placement.  Under these circumstances, in which a child was being placed outside the state, the *Alexandria P.* court's discussion indicates that ICWA's foster care placement provisions did not apply,

_____

[9]  Amy argues that a section 366.26 hearing must not have occurred because the appellate court's grant of the foster parents' writ of supersedeas directing that the child stay with them until the court decided the appeal (*Alexandria P.*, *supra*, 228 Cal.App.4th at p. 1335) must have stayed the parental rights termination proceeding.  We disagree; the hearing could have occurred before these events occurred.

18

making the only question whether ICWA's adoptive placement preferences *did* apply. (*Alexandria P.*, *supra*, 228 Cal.App.4th at pp. 1346–1347.)  These circumstances are absent here.  Also, the *Alexandria P.* juvenile court's decision relied in part on the father's wishes, further distinguishing the case from the present circumstances.[10] Therefore, *Alexandria P.* is neither precedent nor persuasive authority regarding the issue raised by Amy:  whether we should reject the court's own characterization of its order and construe it to be an adoptive placement.

In short, Amy's arguments that we should analyze the court's order pursuant to ICWA and state law adoptive placement preferences are unpersuasive.  We have no need to address her claims of error pursuant to these adoptive placement preferences further.

### III.

### *The Court's Order Complied with ICWA and State Law Foster Care Placement Preferences.*

Amy next argues that the court's order, even if it was regarding her foster care placement, was erroneous because the Tribe did not issue a tribal resolution changing the order of statutory foster care placement preferences and, in any event, Amy established good cause to override the Tribe's preference.  These arguments also are unpersuasive.

#### A.  The Proceedings Below

As we have discussed, the Tribe's child welfare specialist, Lisa Ruiz, wrote to the Department in August 2014 that Amy was eligible for enrollment in the Tribe, which would intervene in the case.  Subsequently, the Department reported that the Tribe, as

---

[10]  The juvenile court did not cite in support of its ruling the state law provisions regarding foster care placement (§ 361.31, subd. (b)) or adoptive placement (*id.*, subd. (c)), but instead cited the provision allowing it to give priority to a parent's placement preference, section 361.31, subdivision (h).  (*Alexandria P.*, *supra*, 228 Cal.App.4th at p. 1335.)  Section 361.31, subdivision (h) states:  "The court may determine that good cause exists not to follow placement preferences applicable under subdivision (b), (c), or (d) in accordance with subdivision (e)."  Section 361.31, subdivision (e) states in relevant part:  "Where appropriate, the placement preference of the Indian child, when of sufficient age, or parent shall be considered."  The court also cited the adoptive placement preferences outlined in federal law.  (*Alexandria P.*, at p. 1335, citing 25 U.S.C. § 1915(a).)

indicated by Ruiz, preferred that Amy be placed with her full sister, who lived with a foster family in Butte County that was in the process of adopting her. Department social worker Sanches testified that she was not aware that the Tribe passed any resolution stating this preference.

The court authorized Amy's foster placement with her sister in Butte County, rejecting minor's counsel's arguments that Amy's best interests were served by keeping her with Julia and Tracy. Among other things, the court cited its obligations pursuant to section 224 and concluded that ICWA applied because Amy was an Indian child and her sister qualified an "extended family member." The court also cited as support for its decision that the Butte County family had been approved for adoption, and its concerns about Julia's child welfare history and her duplicity in applying for a foster care license.

## B. Relevant Law

Both state law and ICWA identify foster care placement preferences for Indian children. (See 25 U.S.C. § 1915(b); § 361.31, subd. (b).[11]) Both indicate the juvenile

---

[11] 25 United States Code section 1915(b) states in relevant part that "[a]ny child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (i) a member of the Indian child's extended family; [¶] (ii) a foster home licensed, approved, or specified by the Indian child's tribe; [¶] (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or [¶] (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."

Section 361.31, subdivision (b) states: "Any foster care or guardianship placement of an Indian child, or any emergency removal of a child who is known to be, or there is reason to know that the child is, an Indian child shall be in the least restrictive setting which most approximates a family situation and in which the child's special needs, if any, may be met. The child shall also be placed within reasonable proximity to the child's home, taking into account any special needs of the child. Preference shall be given to the child's placement with one of the following, in descending priority order: [¶] (1) A member of the child's extended family, as defined in Section 1903 of the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.). [¶] (2) A foster home licensed,

20

court, subject to certain conditions not at issue here, should give preference, in the absence of good cause to the contrary, to placement of an Indian child with a member of the Indian child's extended family as defined by federal law; a foster home licensed, approved, or specified by the Indian child's tribe; an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs. (*Id*.)

The federal and state provisions are not exactly the same. State law expressly states these preferences are to be considered "in descending priority order" (§ 361.31, subd. (b)), while federal law is silent on this issue. (25 U.S.C. § 1915(b).) On the other hand, federal law states that "if the Indian child's tribe shall establish a different order of preference *by resolution*, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) . . . ." (*Id.*, § 1915(c), italics added.) State law does not refer to any resolution, stating only that "if a different order of placement preference is established by the child's tribe, the court or agency effecting the placement shall follow the order of preference established by the tribe, so long as the placement is the least restrictive setting appropriate to the particular needs of the child as provided in subdivision (b)." (§ 361.31, subd. (d).)

Also, as we have discussed, section 224, which the juvenile court cited in making its decision, instructs our state courts that "[t]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children, and the State of California has an interest in protecting Indian children who are members of, or are eligible for membership in, an Indian tribe." (§ 224, subd. (a)(1).) Among other things, "[i]n all Indian child custody proceedings . . . the court shall consider all of the findings

---

approved, or specified by the child's tribe. [¶] (3) An Indian foster home licensed or approved by an authorized non-Indian licensing authority. [¶] (4) An institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."

21

contained in subdivision (a), strive to promote the stability and security of Indian tribes and families, comply with the federal Indian Child Welfare Act, and seek to protect the best interest of the child." (*Id.*, subd. (b).)

### C. Amy's "Tribal Resolution" Claim

Amy first argues that the juvenile court should not have ordered that Amy could be placed with her sister because, regardless of the Tribe's stated preference to the Department, there was no evidence the Tribe had adopted a resolution about it. Amy contends a resolution was required by ICWA (25 U.S.C. § 1915(c)) because the Tribe was changing the order of ICWA foster placement preferences, since the *first* preference was placement with an extended family member and the *second* preference included a foster home specified by the Tribe. (*Id.*, § 1915(b)(i), (ii); § 361.31, subd. (b)(1), (2).) We disagree that reversal is required for two reasons.

First, as the Department points out, Amy did not raise this argument before the juvenile court, at a time when any purported defect could have been corrected. Therefore, we conclude she has forfeited it on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

Second, even if we were to consider Amy's argument on its merits and accept her interpretation of ICWA as requiring a tribal resolution when a Tribe changes the order of statutory foster care placement preferences, Amy does not establish that the Tribe was required to adopt a resolution in her particular circumstance. This is because she does not establish that anyone contended that she *could* have been placed with an extended family member. Amy does not argue that any extended family member, such as her maternal grandmother, was capable of caring for her or that Tracy, her foster/de facto parent, although distantly related to her mother, met the definition of an "extended family member" under ICWA law.[12]

---

[12] An "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or

Further, the court's order indicates its view that it was in Amy's best interests to be placed with her sister, both because of the benefit of such a long-term relationship with a full sibling and because of its concerns about Julia's prior child welfare history and her previous failure to disclose it when she applied for a foster parent license. This is consistent with the mandate that the court "strive to promote the stability and security of Indian . . . families" and "seek to protect the best interest of the child." (§ 224, subd. (b).)

For all of these reasons, we conclude Amy's "tribal resolution" argument lacks merit.

## D. Amy's "Good Cause" Claim

Amy also argues that she established good cause for overcoming the Tribe's foster care placement preference "because of the detriment to [Amy] from being uprooted from the only family she has ever known and because her best interests lay in remaining with that family." Amy was required to show this good cause by clear and convincing evidence. (*Alexandria P.*, *supra*, 228 Cal.App.4th at pp. 1349–1352.) She fails to show that she did so, if only because she does not contend with the juvenile court's conclusion

---

stepparent." (25 U.S.C. § 1903(2); § 224, subd. (c) ["A determination by an Indian tribe that an unmarried person, who is under the age of 18 years, is . . . eligible for membership in an Indian tribe and a biological child of a member of an Indian tribe . . . shall require the application of the federal Indian Child Welfare Act to the proceedings"].)

We also note that, contrary to the juvenile court's conclusion, Amy's sister does not meet the definition of an "extended family member" under ICWA either, since the definition does not include siblings under the age of 18 and Amy's sister was approximately four years old at the time of the hearing. Nonetheless, we review the propriety of the juvenile court's ruling rather than its reasoning. (*In re A.S.* (2011) 202 Cal.App.4th 237, 246 [" ' "[w]e uphold judgments if they are correct for any reason, 'regardless of the correctness of the grounds upon which the court reached its conclusion' " ' "].) The juvenile court's authorization of Amy's foster care placement with her sister in Butte County was appropriate because that foster home was specified by the Tribe, the second—and, the evidence indicates, first available—foster care placement preference authorized under ICWA and state law. (25 U.S.C., § 1915(b)(ii); § 361, subd. (b)(2).)

that she would benefit from developing a potentially lifelong relationship with her sister[13] and the court's concerns about Julia's prior child welfare history and previous failure to disclose it when applying for a foster care license. Therefore, Amy's "good cause" argument is also unpersuasive.

## IV.

### *Amy's Constitutional Argument is Also Unpersuasive.*

We also reject for multiple reasons Amy's argument that the court's order impermissibly infringed on her constitutionally protected liberty interest in her "family relationship" with Julia and Tracy. Amy's argument is premised on her view that hers was an adoptive placement. She does not establish that this constitutional protection extends to a change in her temporary foster care placement. Also, Amy does not explain why such a liberty interest would preclude the court from ordering a change in her foster care placement based on the conclusion that it was in her best interest to do so, given the benefit to Amy of developing a lifelong relationship with her sister and the court's concerns about Julia's prior child welfare history and her previous failure to disclose it when she applied for a foster parent license.

## DISPOSITION

The juvenile court's order is affirmed.

---

[13] In a section of her brief arguing that the court's order was for an adoptive placement and erroneous as such, Amy argues that she established good cause because of the testimony of Sanches and Kyte regarding her bond with her foster/de facto parents and the purported lack of evidence that this was outweighed by the benefit she would receive from a lifelong bond with her sister. This argument asks that we reweigh the evidence submitted to the juvenile court, ignores the obvious benefit Amy would have from a lifelong relationship with a full sibling, and ignores the court's concerns about Julia's child welfare history and her previous failure to disclose it when she applied for a foster care license. Therefore, it is unpersuasive.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*In re Amy J.* (A145782)